## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **TRAVEL RE-INSURANCE PARTNERS, LTD.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**LIBERTY TRAVEL, INC., GOGO TOURS INC., LIB/GO TRAVEL, INC., and HOLIDAY VACATIONS, INC.,**<br><br>**Defendants.** | 2:09-CV-5033<br><br>**OPINION** |

This matter comes before the Court on a motion by Defendants Liberty Travel, Inc., GOGO Tours, Inc., Lib/Go Travel, Inc., and Holiday Vacations, Inc. (collectively, "Liberty") for summary judgment pursuant to Federal Rule of Civil Procedure 56. Also before the Court is a motion by Plaintiff Travel Re-Insurance Partners, Ltd. ("TRIP") for partial summary judgment.

For the reasons stated below, the Court will deny Liberty's motion in part and grant it in part. The Court will also deny TRIP's motion in its entirety.

## I.    Factual and Procedural Background[1]

Liberty is a group of affiliated travel and leisure companies based in New Jersey. Liberty was founded by Gilbert Haroche and Fred Kassner, and prior to 2008, Liberty was owned directly and indirectly by the founders' families. Liberty has sold vacation packages and travel products to the public and wholesale since approximately 1951. For much of that time, Liberty has also offered to its customers travel insurance provided by third-party insurance companies.

In 1993, Liberty and William Davis, an individual with whom Liberty had a previously existing business relationship, formed TRIP, an affiliated captive company, to reinsure the travel insurance products Liberty sold to its customers. TRIP is a Bermuda corporation with its principal place of business in Bermuda.

---

[1] Except where otherwise noted, the Court draws the facts in this section from the undisputed portions of the parties' Rule 56.1 statements.

Prior to January 31, 2008, Liberty owned a 75% interest in TRIP, and Mr. Davis was a shareholder and director of TRIP.

In 1994, TRIP entered into the Personal Accident Reinsurance Agreement ("PARA") with American International Group, Inc. ("AIG"), an insurance corporation that issued the insurance products Liberty sold. The PARA was amended several times, and by June 23, 1996, TRIP had agreed to reinsure 100% of the insurance that Liberty sold. AIG remained the issuer and had the primary responsibility of paying claims in the first instance.

At this time, the relationship between Liberty and TRIP was not memorialized in a written agreement, but the parties followed a settled course of conduct. Liberty's customers paid an up-front premium to Liberty for travel insurance. Liberty retained a percentage of this premium as a commission and sent the remaining amount to BerkelyCare, Inc. ("Berkely"), a third-party company associated with Mr. Davis that processed and serviced insurance claims. Berkely retained a percentage of the premium as a service fee and sent the balance to AIG. AIG retained a portion as a fee and reserved the remainder for paying out claims. At the end of every month, AIG provided statements to TRIP reflecting the flow of funds. As per its reinsurance obligations, if insurance claims paid out by AIG during a given time exceeded the amount of premiums AIG received, TRIP was responsible for paying the difference to AIG. But if insurance claims paid out by AIG fell below the amount of premiums it reserved, AIG paid the difference to TRIP. This arrangement allowed Liberty to generate significant insurance revenue.

Prior to 2008, Liberty made somewhat irregular payments to TRIP that both parties refer to as "Salvage". When a customer cancelled an already purchased trip, Liberty assessed certain penalties against the customer. Liberty would then use the penalty amount to pay its travel suppliers, who assessed a penalty against Liberty for the cancellation. Customers who purchased travel insurance could recover the amount of the cancellation penalties from AIG. As per the PARA, TRIP would ultimately be responsible for the payment of such claims. If a travel supplier did not assess a penalty against Liberty or issued a credit or reimbursement to Liberty for any cancellation penalty it preemptively paid, Liberty would end up with excess funds. The parties referred to those funds as Salvage. The parties dispute the exact amount of Salvage that was due or paid during this time and how Salvage was accounted for, but over the course of several years, Liberty paid substantial amounts of Salvage to TRIP.

On November 10, 2007, Flight Centre USA, Inc. ("Flight Centre") entered a Stock Purchase Agreement ("SPA") pursuant to which Flight Centre agreed to acquire all of the equity of Liberty from the previous owners. But Flight Centre was unable to conduct sufficient due diligence with respect to TRIP and, rather than include TRIP as part of the acquisition, Flight Centre agreed to use TRIP as

its exclusive supplier of third-party travel insurance. Ownership of TRIP fell to Mr. Davis, Mr. Haroche, and Mr. Kassner's daughter, Michelle Kassner. The acquisition closed on January 31, 2008.

Pursuant to the SPA, Liberty and TRIP entered into the Exclusivity Agreement which provided that TRIP would act as Liberty's sole and exclusive source for travel insurance products. Pursuant to Section 3 of the Exclusivity Agreement, TRIP would arrange travel insurance products for resale by Liberty for a period of three years

> so long as (a) TRIP arranges the Insurance Products on terms and conditions reasonably competitive with those offered in the market for similar products in the United States . . .; and (b) TRIP possesses such permits as are necessary for it to arrange for the Insurance Products.

Section 4(d) of the Exclusivity Agreement provided that, on a quarterly basis, Liberty was required to "deposit to the TRIP Account an amount in cash equal to the value of all Collections received . . . in respect of Salvage attributable to claims made on Covered Travel." The Exclusivity Agreement defined Salvage as "include[ing], without limitation, all reimbursements, refunds, returned termination or other penalty fees, credits, amounts or other consideration credited, received or accrued by any of the Companies from a Travel Supplier in respect to Covered Travel that has been canceled, interrupted or otherwise delayed." Section 4 also required Liberty to "record . . . all Salvage attributable to claims made on Covered Travel and all Collections received . . . in respect of such Salvage." After the acquisition, Berkely and AIG continued to play similar roles with respect to processing claims and underwriting, respectively.

Approximately one month after the acquisition, in or around February 2008, Liberty reached out to TRIP to discuss a possible renegotiation of the Exclusivity Agreement's terms with respect to its Salvage obligations. Mr. Davis traveled to Liberty's New Jersey headquarters on or around March 5, 2008 for a meeting with Liberty representatives at which the attendees discussed Liberty's Salvage obligations. Liberty representatives noted the difficulty inherent in calculating Salvage and proposed buying out its obligations to pay Salvage by reducing its commission on the sale of TRIP's insurance products. The parties continued to discuss a possible renegotiation through March and April 2008 but never reached an agreement. The lack of a buyout notwithstanding, Liberty did not end up paying Salvage to TRIP for either 2008 or 2009, and Liberty never conducted an accounting to determine the exact amount of Salvage due, if any.

Shortly thereafter, Liberty began discussions with representatives of RBC Insurance Company of Canada ("RBC"). Prior to its acquisition of Liberty, Flight Centre had entered into an agreement with RBC whereby RBC would act as Flight Centre's exclusive provider of travel insurance. Pursuant to Articles 1.6 and 1.7 of

that agreement, Flight Centre agreed that when it acquired a new company with an existing contract for travel insurance it would, "subject to the terms and conditions of [the] existing contract between any newly acquired travel agent, travel wholesaler, tour operator and/or travel distribution channel and a travel insurance provider, take all reasonable steps necessary to terminate such contract at the earliest possible date." The parties dispute the exact date on which discussions began, but at least as early as March 2008, a representative of RBC contacted Liberty and Flight Centre about providing insurance products. These discussions continued over the course of the summer of 2008.

Around that same time, TRIP reorganized its relationships with AIG and Berkely. TRIP terminated the PARA, effective June 1, 2008, thereby eliminating its reinsurance burden going forward. TRIP then entered into a new agreement with Berkeley and AIG, effective June 1, 2008, under which AIG agreed to fully insure the travel insurance sold by Liberty during the remaining term of the Exclusivity Agreement (the "Berkeley Agreement").[2] In addition to bearing 100% of the risk of insurance, AIG would also then be entitled to retain 100% of the underwriting profits. In consideration for this new arrangement, Berkeley and AIG agreed that each would contribute $600,000 to an escrow fund that would be paid to TRIP at the end of the Exclusivity Agreement's term. In the event that TRIP owed any money to AIG under the PARA, those funds would be used partially or fully to offset any remaining payments due. The Berkely Agreement also provided that in the event that claims made by customers who purchased travel insurance fell below expectations, TRIP would receive a one-time $200,000 payment, presumably to avoid a windfall. Ms. Kassner executed the Agreement on TRIP's behalf.

By late September 2008, Liberty had met with representatives of RBC and received proposals to replace TRIP from both RBC and another insurance provider, CSA Travel Protection, Inc. ("CSA"). Liberty's internal evaluation of the proposals found that CSA's proposal was worth more than its arrangement with TRIP. The evaluation also established that both CSA's proposal and Liberty's arrangement with TRIP were substantially worth more to Liberty than RBC's proposal. Liberty did not provide this valuation information or any of the content of the opposing proposals to TRIP. On October 6, 2008, representatives from Liberty met with representatives of RBC and CSA to discuss the proposals. Also on October 6, 2008, representatives of Liberty met with Mr. Davis and a representative of Berkely to discuss the Exclusivity Agreement and products and services provided by Berkely and TRIP. Sometime thereafter in October, representatives of Liberty and TRIP met to discuss the settlement of a variety of

---

[2] Although the Berkeley was made effective as of June 1, 2008, TRIP did not execute the agreement until September 12, 2008, and Berkeley did not execute until October 31, 2008.

issues arising from the acquisition.

On October 28th, 2008, Natalie Benson, Liberty's Chief Financial Officer, sent an email to Ms. Kassner containing a six-page document outlining various proposals to resolve issues raised during the settlement discussions (the "October 28th Email"). Two of the six pages were devoted specifically to the Exclusivity Agreement, and in sum, expressed Liberty's opinion that there was no post-acquisition Salvage to pay and that TRIP was not commercially competitive with offers Liberty received from other insurance providers. Liberty then proposed that it be allowed to terminate the Exclusivity Agreement in exchange for a payment of $100,000. Ms. Kassner did not respond to these statements, and these negotiations did not lead to a resolution regarding the Exclusivity Agreement.

In early 2009, Liberty continued its discussions with RBC to replace TRIP. Although internal email reveals that Liberty considered the initial proposal from CSA to be much more valuable than the proposal from RBC, Liberty provided RBC an opportunity to match CSA's proposal. In February 2009, Liberty conducted an internal evaluation that determined that the total value of the Exclusivity Agreement with TRIP over a five-year term would be more valuable than the terms offered by RBC's proposal. Liberty provided information regarding the Exclusivity Agreement and CSA's proposal to RBC and gave RBC an opportunity to come up with a better offer. On March 5, 2009, after further negotiations, Flight Centre and RBC entered into a letter of intent reflecting their agreement to make RBC the exclusive supplier of travel insurance to Liberty. The letter was conditional upon the termination the Exclusivity Agreement.

On April 17, 2009, Liberty sent to TRIP a letter of intent to sever the Exclusivity Agreement. The letter stated that after a review of market data, Liberty had determined that TRIP's products failed to deliver reasonably competitive economic terms and conditions. The letter provided to TRIP for the first time the market data on which Liberty relied in making its determination. The letter also provided that TRIP had until April 24th to deliver to Liberty evidence that TRIP's products were reasonably competitive and evidence that TRIP was in compliance with all applicable licenses, permits, and authorizations as contemplated by the Exclusivity Agreement. On April 29, 2009, counsel for TRIP sent a response to Liberty advising that responses to the issues raised in the letter of intent would be forthcoming. On May 8, 2009, Liberty notified TRIP via letter that TRIP had failed to respond by the original April 24th deadline and further advised TRIP that Liberty was terminating the Exclusivity Agreement.

On May 11, 2009, TRIP's counsel responded that TRIP was willing to meet with Liberty to review the market data provided and discuss the competitiveness of TRIP's insurance products. The letter also advised Liberty that Berkely and AIG held the necessary licenses and authorizations contemplated by the Exclusivity

Agreement. The letter further advised Liberty that it was in breach of the
Exclusivity Agreement based on its failure to pay Salvage. On May 20, 2009, RBC
and Flight Centre entered a formal agreement that designated RBC as the exclusive
provider of travel insurance products to Liberty. On September 30, 2009, TRIP
filed this lawsuit.

## II.   Summary Judgment Standard

A party seeking summary judgment must "show that there is no genuine
issue as to any material fact and that the movant is entitled to judgment as a matter
of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold
inquiry is whether there are "any genuine factual issues that properly can be
resolved only by a finder of fact because they may reasonably be resolved in favor
of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (noting
that no triable issue exists unless there is sufficient evidence favoring nonmoving
party for jury to return verdict in its favor). In deciding whether triable issues of
fact exist, this Court must view the underlying facts and draw all reasonable
inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231,
236 (3d Cir. 1995). However, the non-moving party "may not rest upon the mere
allegations or denials of his pleading, but his response, by affidavits or as
otherwise provided in this rule, must set forth specific facts showing that there is a
genuine issue for trial. If he does not so respond, summary judgment, if
appropriate, shall be entered against him." *Matsushita*, 475 U.S. at 586.

## III.   Liberty's Motion for Summary Judgment

### A. Breach of Contract Under New York Law

Both parties urge the Court to apply New York law to TRIP's contract
claims, noting that Section 10.6 of the Exclusivity Agreement provides that the
agreement will be construed in accordance with New York law. Because neither
party objects to the validity of this choice-of-law provision, the Court will apply
New York law. *See, e.g.*, *Deshpande v. Taro Pharm. U.S.A., Inc.*, No. 10-865,
2010 WL 1957869, at *2 (D.N.J. May 13, 2010).

Under New York law, "the initial interpretation of a contract is a matter of
law for the court to decide." *K. Bell & Assoc. v. Lloyd's Underwriters*, 97 F.3d
632, 637 (2d Cir. 1996). "Included in this initial interpretation is the threshold
question of whether the terms of the contract are ambiguous." *Alexander &*

6

*Alexander Serv., Inc. v. Certain Underwriters at Lloyd's, London*. 136 F.3d 82, 86 (2d Cir. 1998). Contract terms are ambiguous if they suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997). When a contract is not ambiguous, the court "should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." *Alexander*, 136 F.3d at 86. But "only where the language and the inferences to be drawn from it are unambiguous may a district court construe a contract as a matter of law and grant summary judgment accordingly. *Id.* (quotation omitted).

The elements of a cause of action for breach of contract are: (1) formation of a contract between the plaintiff and the defendant; (2) performance by the plaintiff; (3) the defendant's failure to perform; and (4) resulting damage. *Clearmont Property, LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (N.Y. App. Div. 2009).

### B. Non-Performance

Liberty claims that TRIP failed to perform under the Exclusivity Agreement in at least two material respects and that these failures to perform prevent TRIP from raising its claims for breach of that agreement. Liberty is generally correct that if a party fails to substantially perform under an agreement it may be unable to succeed on a cause of action for breach of that agreement. *See, e.g.*, *Windjammer Homes, Inc. v. Lieberman*, 717 N.Y.S.2d 362, 363 (N.Y. App. Div. 2000). But for the reasons stated below, the Court must deny Liberty's motion for summary judgment on both points.

### i. *Failure to Engage in a Joint Review of Reasonable Competitiveness*

Under Section 3(a), the determination of whether TRIP's products were reasonably competitive was "to be made by [Liberty] and TRIP upon review of all market data reasonably available." Both parties construe Section 3(a) of the Exclusivity Agreement as requiring the parties to jointly review the reasonable competitiveness of TRIP's products – the Court agrees with this construction. And both parties agree that no joint determination occurred. But, unsurprisingly, the parties do not agree on who bears the fault for that failure. Liberty claims that TRIP breached this requirement of the Exclusivity Agreement, and asks for summary judgment on this issue.

7

Genuine issues of material fact compel the Court to deny Liberty's motion for summary judgment on this point. Each party has put forth evidence suggesting that the other party failed to engage in the joint determination. TRIP met with Liberty in early October 2008 to discuss TRIP's products. Liberty also claims that at that time its representatives informed TRIP that Liberty was accepting bids from competing insurance providers to replace TRIP, although TRIP denies that it received such notice. Liberty further claims that the October 28th Email to Ms. Kassner should have put TRIP on notice that its products were not reasonably competitive. Finally, Liberty points to the April 17, 2009 letter, which clearly noted that Liberty had deemed TRIP's products not competitive and demanded that TRIP produce evidence to the contrary to avoid termination of the Exclusivity Agreement. Liberty argues that these facts, taken in sum, clearly establish that it attempted to conduct a joint determination and TRIP bears the blame for the lack thereof. But TRIP denies that it had notice that Liberty was receiving other offers, and denies that the October 28th Email, which covered a variety of topics, was an actual request for a joint determination. TRIP claims that Liberty's first actual request for a joint determination occurred on April 17, 2009, when it sent the letter regarding its intent to terminate. And TRIP points to its response letter of May 11, 2009, in which it offered to meet with Liberty to discuss the competitiveness of its products and review market data. TRIP notes that it was Liberty who thereafter refused to meet and instead terminated the Exclusivity Agreement. On this record, a reasonable juror could find sufficient evidence to blame the failure to engage in a joint determination on either party. Thus, the Court cannot grant summary judgment on this issue.[3]

### ii.  TRIP's Licensing Requirements under the Exclusivity Agreement

Liberty argues that TRIP also failed to perform because it did not provide evidence to Liberty that it was properly licensed pursuant to the Exclusivity Agreement despite Liberty's repeated demands. Liberty has put forth evidence suggesting that it made repeated demands for proof of such possession, and Liberty further claims that TRIP did not satisfy those demands. But Liberty does not point to any language in the Exclusivity Agreement that required TRIP to produce its

---

[3] The Court need not – and does not – reach the issue of whether this breach, if proven to be TRIP's fault, would actually preclude TRIP from succeeding on its claims for breach of contract: whether a breach of a contract is material so as to excuse non-performance by the non-breaching party is a mixed question of law and fact and usually is an issue for the jury. *See Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 295-96 (S.D.N.Y. 2005) (denying motion for summary judgment) (citing cases). To the extent TRIP also seeks summary judgment on this issue, this reasoning applies equally and compels the Court to deny TRIP's motion on this issue as well.

licenses to Liberty on demand. The real issue is whether or not TRIP actually possessed the necessary permits and licenses. Liberty's motion fails on this point as well, because Liberty has not put forth any evidence suggesting that TRIP does not possess such permits and licenses.

Pursuant to Section 3(a) of the Exclusivity Agreement, TRIP was entitled to act as Liberty's exclusive provider of travel insurance products so long as TRIP "possesses such permits as are necessary for it to arrange for the Insurance Products." There is nothing ambiguous about this clause. The Exclusivity Agreement does not require TRIP to possess any specific permits or licenses – for example, the Exclusivity Agreement does not require TRIP to possess a license to act as an insurance broker in California. Nor does it explicitly empower Liberty to directly define for TRIP what permits or licenses it needs to hold. Rather, it only requires TRIP to possess what is "necessary for it to arrange for the Insurance Products" it has agreed to provide to Liberty pursuant to the Exclusivity Agreement. Giving this language a plain reading, the lack of specificity creates a dynamic obligation. This interpretation fits neatly with the overall Exclusivity Agreement, Section 3(d) of which provides for the offering of new insurance products in the future. If certain permits become necessary because of a new product, TRIP would arguably be required to possess those permits in order to act as Liberty's exclusive provider of that product. And if TRIP did not need to possess any permits to arrange for the necessary insurance products, TRIP could still be performing even if it did not possess any permits.

The dynamic nature of this obligation is a critical reason that Liberty's motion for summary judgment fails on this point. Liberty concedes that Mr. Davis provided it with evidence of his own license to sell insurance in the State of New Jersey. And while Liberty claims that it was never provided with documentation establishing that TRIP itself was actually authorized to supply Liberty with the necessary products in all the jurisdictions in which Liberty operated, it has not put forth any evidence establishing that TRIP needed to actually possess any particular permits or licenses. For example, Liberty has not put forth any evidence that TRIP was unable to arrange for any insurance products because of a lack of licensing. As such, Liberty has failed to provide any evidence on which a reasonable juror could conclude that TRIP was in breach of its licensing obligations under the Exclusivity Agreement.[4]

---

[4] And while the Court need not make this type of factual determination to decide Liberty's motion, Liberty's inability to produce evidence of TRIP's breach may be because TRIP did not need to actually possess any licensing. TRIP maintains that it did not need other licenses or permits because it was neither interfacing with Liberty's insurance customers nor was it acting as an underwriter. Liberty has not put forth any evidence to refute TRIP's contention. And TRIP has put forth evidence, albeit disputed, suggesting that representatives of TRIP were either satisfied with TRIP's representations or were not aware of what licensing, if any, TRIP actually lacked.

C. Lack of Damages

Liberty argues that if TRIP is unable to present any evidence of actual damages, then the Court must grant summary judgment for Liberty and dismiss TRIP's claims for breach of contract. Courts applying New York law have frequently defined damages as an "essential element" of a claim for breach of contract. *See, e.g.*, *Inter-Community Memorial Hosp. of Newfane, Inc. v. Hamilton Wharton Group, Inc.*, 941 N.Y.S. 2d 360, 364 (N.Y. App. Div. 2012) ("Damages are an essential element of a breach of contract cause of action."). The implications of this phrase, taken in isolation, are unclear. But a general review of New York law regarding breach of contract actions reveals that Liberty's interpretation is incorrect.

If there are genuine issues of material fact as to the existence of damages, a court may not grant summary judgment for the defendant even if the nature of the damages is uncertain. *See, e.g.*, *V.S. Int'l, S.A. v. Boyden World Corp.*, No. 90 Civ. 4091, 1993 WL 59399, at *7 (S.D.N.Y. Mar. 4, 1993). But even if there are no genuine issues of material fact as to the existence of damages, a court still cannot grant summary judgment for the defendant on the issue of liability; instead, the proper action is to limit the plaintiff's recovery to nominal damages. *Id.* ("The Court emphasizes that, even if plaintiffs failed to raise an issue of material fact as to actual damages, they would still be entitled to proceed to trial to recover nominal damages and vindicate their contractual right."); *see also Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993) ("Nominal damages are always available in breach of contract actions"); *Hirsch Elec. Co., Inc. v. Community Servs., Inc.*, 536 N.Y.S.2d 141, 142-43 (N.Y. App. Div. 1988) (reversing dismissal of complaint on summary judgment and holding "although the plaintiff has failed to demonstrate damages which would be recoverable at trial with respect to the lost profits claim, it is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any.").

Thus, the Court will consider whether there are genuine issues of material fact with respect to TRIP's claims for damages. To the extent the Court finds that genuine issues of fact exist, the Court will deny Liberty's motion. To the extent the Court finds that TRIP has failed to put forth any evidence supporting a finding of actual damages, the Court will not dismiss TRIP's claims but will instead limit TRIP's recovery to nominal damages.

TRIP notes two ways in which it was damaged: first, it claims it was damages because Liberty's termination required it to breach the Berkely Agreement thereby depriving it of the fruits of that contract; and second, TRIP

claims it was damaged by Liberty's failure to pay Salvage. The Court will consider Liberty's arguments regarding both sources of damage in turn.

### i. Foreseeability of Damages Arising from the Berkely Agreement

Liberty argues that damages arising from the Berkely Agreement were not foreseeable and thus, not recoverable. But Liberty is incorrect. While not all damages arising from the Berkely Agreement may have been foreseeable, it was foreseeable that Liberty's termination of the Exclusivity Agreement would result in some damages arising from TRIP's relationships with Berkely and AIG.

Under New York law, a non-breaching party may recover general damages which are the natural and probable consequence of the breach. *Bi–Economy Mkt., Inc. v. Harleysville Ins. Co. of NY*, 886 N.E.2d 127, 130 (N.Y. 2008). Special, or consequential damages, which do not so directly flow from the breach, are also recoverable in limited circumstances. *Id.* (citing *American List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989)). Damages which stem from losses incurred by the nonbreaching party because of its dealings with third parties generally fall under this category of consequential damages. *See, e.g.*, *437 Madison Ave. Assocs. v. A.T. Kearney, Inc.*, 488 N.Y.S.2d 950, 951 (N.Y. Sup. 1985). A party claiming consequential damages must prove: (1) that the existence of the damages is reasonably certain; (2) that the damages were foreseeable and within the contemplation of both parties when the contract was made; and (3) the amount of damages with reasonable certainty. *Kenford Company, Inc. v. County of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986). "It is not necessary for the breaching party to have foreseen the breach itself or the particular way the loss occurred, rather, it is only necessary that loss from a breach is foreseeable and probable." *Bi-Economy*, 886 N.E.2d at 130 (quotation omitted).

Liberty claims that it is entitled to summary judgment on the issue of TRIP's damages flowing from the termination of the Berkely Agreement because TRIP has produced no evidence showing that Liberty knew of the exact terms of the Berkely Agreement or the unusual nature of TRIP's modified relationship with Berkely. Liberty also claims that at the time of the acquisition, TRIP owed AIG a large debt, another fact of which Liberty claims to have been unaware. TRIP disputes these factual claims, but even assuming these facts were undisputed, Liberty would still face some liability for damages arising from its breach of the Exclusivity Agreement.

It is undisputed that Liberty knew that TRIP would be arranging for insurance products through Berkley and AIG – indeed, various provisions of the Exclusivity Agreement explicitly contemplate this. Section 2 even provides that TRIP shall have the sole responsibility to "negotiate the terms and conditions of all

11

such third party relationships" suggesting that Liberty knew the nature of the business arrangement was subject to change at TRIP's discretion. Thus, it was foreseeable that Liberty's breach of the Exclusivity Agreement could result in TRIP breaching its obligations with third parties, and accordingly, damages arising from those third-party relationships were foreseeable. Even if Liberty was not aware of the Berkely Agreement, Liberty's should have realized that its termination of the Exclusivity Agreement could result in TRIP losing its reinsurance profits. That Liberty did not know the precise terms of the Berkely Agreement does not bear on whether some damages arising from its breach were foreseeable. *See Bi-Economy*, 886 N.E.2d at 130.

But whether the entirety of TRIP's alleged damages from the Berkely Agreement were foreseeable is a different matter. The Court finds the Restatement (Second) of Contracts, § 351 helpful in addressing this issue.[5] Comment b, illustrations 5 & 6 of Section 351 state:

> 5. A and B make a contract under which A is to recondition by a stated date a used machine owned by B so that it will be suitable for use in B's canning factory. A knows that the machine must be reconditioned by that date if B's factory is to operate at full capacity during the canning season, but nothing is said of this in the written contract. Because A delays in returning the machine to B, B loses its use for the entire canning season and loses the profit that he would have made had his factory operated at full capacity. B's loss of reasonable profit was foreseeable by A as a probable result of the breach at the time the contract was made.
>
> 6. The facts being otherwise as stated in Illustration 3, the profit that B would have made under his contract with A was extraordinarily large because C promised to pay an exceptionally high price as a result of a special need for the machine of which A was unaware. A is not liable for B's loss of profit to the extent that it exceeds what would ordinarily result from such a contract. To that extent the loss was not foreseeable by A as a probable result of the breach at the time the contract was made.

Like illustration 6, above, to the extent that the damages arising from TRIP's third-party relationships may have been extraordinarily large because of an unusual arrangement TRIP had with Berkely and AIG, the damages were not necessarily foreseeable. Thus, while the Court will deny Liberty's motion for summary judgment on the issue of damages arising from termination of the Berkely Agreement, the Court also notes that TRIP will not necessarily be entitled to recovery of the full value of that agreement. Genuine issues of material fact prevent the Court from determining the exact amount of damages at this time. But

---

[5] In developing and applying law relating to foreseeability of damages in contract actions, New York courts have repeatedly looked to the Restatement (Second) of Contracts. *See, e.g., Ashland Management Inc. v. Janien*, 624 N.E.2d 1007, 1010-11 (N.Y. 1993) (citing Restatement (Second) of Contracts §§ 351, 352).

in any event, TRIP will only be able to recover damages that it can prove through competent evidence were foreseeable at the time the parties entered into the Exclusivity Agreement. Liberty will not be liable for any additional damages created by unusual facts or arrangements of which it was not aware at that time.

### ii.  Failure to Mitigate

Liberty also claims it cannot be liable to TRIP for any damages arising from the Berkely Agreement because TRIP failed to mitigate its damages. Specifically, Liberty argues that because there was some evidence that it may seek to terminate the Exclusivity Agreement, TRIP's obligation to mitigate its damages required it to refrain from entering into the Berkely Agreement. The Court must deny Liberty's motion on this point as well.

"New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages." *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489,494 (2d Cir. 1985). In practice, this rule means that "[d]amages which the plaintiff might have avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered either as not having been caused by the defendant's wrong or as not being chargeable against the defendant." Williston on Contracts, 4th § 64:27. Generally, the duty to mitigate damages comes into play only after a breach has occurred and it appears that the breaching party has abandoned or repudiated its obligations under the contract. *See, e.g.*, *U.S. Bank. Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010); *see also Dankrag, Ltd. v. International Operating Co., Inc.*, 729 F. Supp. 360, 366 (S.D.N.Y. 1990) (fixing date of breach as date that obligation to mitigate damages began). "If negotiations between the parties are pending, if assurances are made that performance will be forthcoming, or if other circumstances indicate that the breaching party intends to perform, then, even though the contract has been breached, no duty to mitigate arises." *United States v. Russell Elec. Co.*, 250 F. Supp. 2, 20 (S.D.N.Y. 1965). The defendant bears the burden of establishing not only that the plaintiff failed to make diligent efforts to mitigate but also the extent to which such efforts would have diminished the plaintiff's damages. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 899 N.Y.S.2d 15 (N.Y. App. Div. 2010).

Genuine issues of material fact prevent the Court from granting summary judgment on this issue. Liberty contends that the October 28th Email placed TRIP on notice that its products were not reasonably competitive, and thus, that termination was imminent. The parties dispute the import and proper interpretation of the email, which covers a number of areas unrelated to TRIP and, as discussed above, Liberty did not send the email in compliance with Section 10.3. Given these

disputes, the Court cannot resolve whether the October 28th Email acted as the kind of repudiation that might properly trigger TRIP's obligation to mitigate damages. And even assuming for the sake of argument that Liberty's email provided TRIP with actual notice of an intent to terminate, the undisputed facts show that Liberty continued to conduct business with TRIP pursuant to the Exclusivity Agreement for approximately six months after sending it. Arguably, these other circumstances indicated that Liberty still intended to perform under the Exclusivity Agreement regardless of its expressed concerns regarding the reasonable competitiveness of TRIP's products. Thus, the Court must deny Liberty's motion on the issue of mitigation.

### iii.  Damages Arising from Salvage Obligations

Liberty also argues that TRIP has failed to produce any evidence of damages arising from its conceded failure to pay Salvage to TRIP after the acquisition. The Court must deny Liberty's motion on this point as well.

The parties do not dispute the basic facts regarding the history of Salvage payments. Prior to the acquisition, Liberty paid some money to TRIP that the parties classified as Salvage: $2.3 million in 2004, $800,000 in 2005, $500,000 in 2006, and either $500,000 or $750,000 in 2007. The parties acknowledge that these payments were based on estimates, although they dispute whether or not the estimates were reliable and accurate. And while, as discussed above, the parties had attempted to negotiate a buy-out of Liberty's Salvage obligations under the Exclusivity Agreement, their negotiations were ultimately fruitless. Ultimately, Liberty never conducted an accounting of Salvage for the years after the acquisition, and that lack of an accounting puts both parties in a difficult position in terms of proving factual issues relating to salvage.

Liberty has produced evidence it claims shows that there was no post-acquisition Salvage to pay, but in reality, also this evidence shows is that Liberty never conducted a true assessment. Ms. Benson testified that travel suppliers were aggressive in charging for all available penalties, including some penalties incurred prior to the acquisition. Testimony of Allen Lindstron, Liberty's Chief Financial Officer prior to the acquisition, and Darlene Boylan, Liberty's Controller, corroborate Ms. Benson's testimony regarding this increased aggressiveness. Ms. Benson estimated in the October 28th Email that after the acquisition, Liberty paid out approximately $1.3 million to travel suppliers for cancellation penalties incurred in 2007. Liberty maintains that it would be entitled to deduct this amount from any Salvage payable to TRIP. Ms. Benson testified that she extrapolated from all these facts and arrived at the opinion that there was no post-acquisition Salvage to pay. But this is not proof of a lack of Salvage as much as it is the opinion of an

14

employee of an interested party. Liberty's real argument in favor of summary judgment is that TRIP has failed to produce any evidence to support the existence of post-acquisition Salvage.

Contrary to Liberty's assertions, TRIP has put for sufficient evidence to create a genuine issue of material fact with respect to damages arising from Liberty's Salvage obligations. In support of its claim for damages, TRIP points to the fact that Liberty paid some Salvage prior to the acquisition and the fact that Liberty assumed it owed TRIP Salvage when it compared the value of its deal with TRIP to the value of offers by third-party insurance providers as part of its reasonable competitiveness determination.[6] TRIP also points to Ms. Benson testimony that despite her opinion that there was no Salvage to pay, she could not be absolutely certain that Salvage was "zero dollars" without conducting an accounting. While these pieces of evidence do not establish the existence of Salvage with certainty, they do tend to support an inference that some Salvage existed after the acquisition. Standing on their own, they would likely be sufficient to defeat Liberty's motion for summary judgment. *See, e.g.*, *Medinol v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 600 (S.D.N.Y. 2004) (denying motion for summary judgment); *Parfums Stern Inc. v. International trade and Export Co., Inc.*, No. 89 Civ. 2086, 1991 WL 84757, at *2 (S.D.N.Y. May 13, 1991) (same). But the Court need not consider this evidence in isolation.

TRIP has produced evidence suggesting that the lack of direct evidence regarding the existence and amount of Salvage resulted only because Liberty chose not to conduct a precise accounting. Liberty does not deny that it never accounted for Salvage. Liberty only claims that it cannot be responsible for the lack of accounting because TRIP never demanded an accounting and thus, waived its rights to one under the Exclusivity Agreement. But the Court finds this argument unpersuasive.

Liberty has not put forth evidence supporting a finding that TRIP waived. "Waiver is an intentional relinquishment of a known right and should not be lightly presumed." *Gilbert Frank Corp. v. Federal Ins. Co.*, 70 N.Y.2d 966, 968 (N.Y. 1988) (citing 5 Williston Contracts §§ 696-697, at 338-40 (3d Ed. 1961)). "[T]he intent to waive must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act." *Ess & Vee Acoustical & Lathing Contractors, Inc. v. Prato Verde, Inc.*, 702 N.Y.S.2d 38, 39 (N.Y. App. Div. 2000) (quoting *Orange Steel Erectors, Inc. v. Newburgh Steel Prods., Inc.*, 640 N.Y.S.2d 283, 285 (N.Y.

---

[6] TRIP also points to the fact that Liberty accrued approximately $80,000 per month during 2008 in recognition of its Salvage obligations and that Liberty made several offers to buy-out its Salvage obligations, both of which suggest that some Salvage existed. But Liberty challenges the admissibility of this evidence. Because the Court does not need to rely on this evidence in denying Liberty's motion for summary judgment, the Court will not reach the issue of admissibility, and, for the purposes of this motion, will ignore this evidence.

App. Div. 1996)). Liberty's only evidence for waiver is that in March of 2008, shortly after the acquisition, the parties began discussing a buyout arrangement whereby Liberty would compensate TRIP in exchange for which Liberty would not be required to account for – or pay to TRIP – salvage. But generally, negotiations that could resolve issues of non-performance but that do not result in a resolution do not constitute waiver because they do not manifest a clear intent to waive the right of performance. *Gilbert Frank Corp.*, 70 N.Y.2d at 968; *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 710 (S.D.N.Y. 2007) (denying motion for summary judgment on issue of waiver finding evidence of settlement discussions regarding alleged breaches was insufficient evidence of waiver). If they did, a party that is required to perform under a contract could induce the other party to the contract from excusing non-performance merely be initiating discussions regarding alternatives to performance. Such a broad interpretation of the waiver doctrine would disincentives parties from engaging in useful post-contractual negotiations. And this specific incidence of negotiation does not show any clear intent on TRIP's part to suggest it would excuse Liberty from accounting – indeed, if the parties had not reached an agreement, and the contractual relationship had continued, TRIP would be well within its contractual rights to insist that Liberty account for and pay any owed salvage.

Because Liberty bears responsibility for failing to account for the Salvage, it cannot now use its own failing to deprive TRIP of an opportunity to prove its case. Had Liberty conducted an accounting of Salvage and reported that accounting to TRIP – as Section 4 of the Exclusivity Agreement required it to do – the parties likely could have avoiding some or all of this uncertainty. The accounting may have even supported Liberty's position. But because Liberty created this uncertainty, it must bear its weight. *See Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.*, 10 F. Supp. 2d 345, 369 (S.D.N.Y. 1998) (citing cases).

At trial, the proofs may show that Liberty's failure to pay salvage did not in fact damage TRIP because there was no salvage to be paid. In such case, assuming TRIP proves breach, it would be entitled only to nominal damages. But on the record before the Court, there are genuine issues of material fact preventing the Court from determining with certainty that no post-acquisition salvage existed.

### D. Unjust Enrichment

Neither party argues that there are factual issues pertinent to TRIP's claim for unjust enrichment. Liberty argues that the Court must dismiss TRIP's claim for unjust enrichment as a matter of law because it is identical to TRIP's claim for breach of contract. While this legal reasoning is not precisely correct, Liberty is

16

generally correct that TRIP's claim for unjust enrichment must fail in light of TRIP's claim for breach of contract and the existence of a valid contract.

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). But "a party is not precluded from proceeding on both breach of contract and unjust enrichment (or quasi-contract) theories where there is a bona fide dispute as to the existence of the contract, or where the contract does not cover the dispute in issue." *VCG Special Opportunities Master Fun Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 344 (S.D.N.Y. 2008) (citing cases); *Maimonides Medical Center v. First United Am. Life Ins. Co.*, --- N.Y.S.2d ----, 2012 WL 592180, at *6 (N.Y. Sup. 2012) (citing *Joseph Sternberg, Inc. v. Walber 36th Street Assoc.*, 594 N.Y.S.2d 144 (N.Y. App. Div. 1993)).

Here, neither party has argued that the Exclusivity Agreement was non-existent or invalid. And although each party argues that the other party's breach or breaches excused its own non-performance, that is not the same as arguing that the underlying agreement is invalid. *See, e.g.*, *Town of West Seneca v. Am. Ref Fuel Co. of Niagara, L.P.*, 768 N.Y.S.2d 68, 69 (N.Y. App. Div. 2003) ("[T]he Town did not assert that the contract was invalid but, rather, asserted defendant's alleged breach of the contract as a defense to the Town's nonperformance."). A material breach of a contract may excuse non-performance in certain circumstances without rendering the entire contract invalid.

And TRIP does not argue that its claim for unjust enrichment arises from conduct outside of the subject matter governed by the Agreement. Instead, TRIP argues that the existence of a contract does not necessarily bar it from bringing a claim for unjust enrichment. While this is a technically correct statement of the general law, it is not true in this case.

For these reasons, the Court will grant summary judgment for Liberty on this point and dismiss Count Three.

### E.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Neither party argues that there are factual issues pertinent to TRIP's claim for breach of the implied covenant of good faith and fair dealing. Liberty argues that the Court must dismiss TRIP's claim for breach of the implied covenant of good faith and fair dealing because it is duplicative of TRIP's claim for breach of contract. Liberty is correct.

"A cause of action alleging breach of the implied covenant of good faith and fair dealing must be dismissed if it is merely duplicative of a breach of contract claim." *Refreshment Mgmt. Servs., Corp. v. Complete Office Supply Warehouse*

*Corp.*, 933 N.Y.S.2d 312, 315 (N.Y. App. Div. 2011) (affirming trial court's dismissal of breach of covenant claim that "merely duplicated" breach of contract claim); *Barker v. Time Warner Cable, Inc.*, 923 N.Y.S.2d 118, 120 (N.Y. App. Div. 2011) (same). A cause of action is duplicative if it is based on the same facts as are alleged in support of the breach of contract claim, *see 2470 Cadillac Res., Inc. v. DHL Exp. (USA), Inc.*, 923 N.Y.S.2d 530, 531-32 (N.Y. App. Div. 2011) ("The third cause of action, for breach of the implied covenant of good faith and fair dealing, is duplicative of the breach of contract cause of action since it is based on the same facts as are alleged in support of that cause of action, i.e., cessation of domestic shipping services, cessation of service to certain zip codes, improper billing and inappropriate rate increases"), or if the plaintiff merely seeks the same damages as it does under its breach of contract action. *See Deer Park Enters., LLC v. Ail Sys., Inc.*, 870 N.Y.S.2d 89, 90 (N.Y. App. Div. 2008) ("A cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of the contract") (quotation omitted).

TRIP claims that the cause of action is not duplicative because it relies on separate factual allegations: specifically, that Liberty never intended to perform under the agreement. But an allegation that a party to a contract had no intention of performing under the contract usually supports a claim for promissory fraud. *See, e.g.*, *Venables v. Sagona*, 925 N.Y.S.2d 578, 581 (N.Y. App. Div. 2011) (describing promissory fraud cause of action); *Leve v. Franklin Capital Corp.*, No. 02 Civ. 2116, 2003 WL 446807, at *5 (S.D.N.Y. Feb. 25, 2003) ("The amended complaint sufficiently alleges promissory fraud, as it alleges that defendants fraudulently promised to pay a total purchase price of $4.5 million when they had no intention of performing the promise.") (applying California law). The Court is not aware of – nor do the parties cite to – any cases decided under New York law where a claim for breach of the implied covenant of good faith and fair dealing arose from allegations that the defendant entered into a contract without the intent to perform. Theoretically, this is a separate factual allegation from TRIP's allegations in support of its breach of contract claim. But to rely on that tenuous distinction would be to elevate form over substance. TRIP has not alleged that Liberty took additional steps to frustrate TRIP's enjoyment of the fruits of the agreement, nor has TRIP alleged that Liberty violated the spirit of some provision of the agreement while technically meeting its obligation thereunder. In essence, TRIP's breach of the implied covenant claim is a variation of its breach of contract claim because the allegedly actionable conduct is still Liberty's allegedly improper termination and its failure to perform under the agreement.

This conclusion is bolstered by the fact that the damage allegedly resulting from the breach of implied covenant cannot be meaningfully differentiated from

18

the damages allegedly resulting from the breach of contract claim. TRIP alleges no damages beyond those damages alleged caused by breaches of the express terms of the Exclusivity Agreement. Thus, the cause of the harm is Liberty's alleged breach of contract, not Liberty's breach of the implied covenant.

For these reasons, the Court will grant summary judgment for Liberty on this point and dismiss Count Two.

## IV.    TRIP's Motion for Partial Summary Judgment

TRIP moves for summary judgment on several of its claims for breach of the Exclusivity Agreement. As discussed above, there are genuine issues of material fact as to whether TRIP is to blame for the failure of the parties to engage in a joint determination of reasonable competitiveness under Section 3(a) of the Exclusivity Agreement. There are also genuine issues of material fact as to whether TRIP was reasonably competitive under that section. Either of these breaches may be sufficient to excuse Liberty for its non-performance. Thus, the Court cannot grant summary judgment for TRIP on its breach of contract claims.[7]

TRIP argues that there are no genuine issues of material fact relating to whether or not it was reasonably competitive. But TRIP's argument depends entirely on the Court accepting TRIP's interpretation of how reasonable competitiveness was to be determined under Section 3(a). Because the Court is not able to determine the proper meaning of that provision on the current record, the Court must deny TRIP's motion for summary judgment on this point as well.

TRIP asks the Court to interpret the Exclusivity Agreement as creating an obligation to provide travel insurance on terms that were reasonably competitive for the consumer. Under TRIP's interpretation, a reasonable competitiveness determination would not include whether the terms and conditions of TRIP's insurance products were more or less advantageous for Liberty than the products provided by alternative suppliers. This distinction is important to this case. TRIP has offered undisputed facts tending to show that the insurance products it arranged were sold to Liberty's customers at the same price and on substantially the same terms as the products arranged by RBC. And Liberty has only argued that its determination that TRIP was not reasonably competitive was based primarily on the fact that Liberty was able to obtain proposals for alternative arrangements that would be more profitable for it. Liberty has not argued that it terminated the Exclusivity Agreement because TRIP's products were not reasonable competitive from the viewpoint of its customers.

Under Section 3(a) of the Exclusivity Agreement, TRIP would act as the

---

[7] Because these genuine issues of material fact create a sufficient basis for denying TRIP's motion, the Court does not reach the parties' remaining arguments regarding the motion.

exclusive arranger of Liberty's insurance products:

> so long as . . . TRIP arranged the Insurance Products on terms and conditions reasonably competitive with those offered in the market for similar products in the United States, such determination to be made by [Liberty's] Representative . . . and TRIP upon review of all market data reasonably available for comparable insurance products, provided that the Parties agree and acknowledge that the rates and other conditions of such Insurance Products shall be on substantially the same terms and conditions [as policies attached as exhibits hereto].[8]

But, on the current record, the Court is not able to determine with certainty what the term "reasonable competitive" means. The plain language of this provision does not support TRIP's interpretation. Nothing explicitly limits the reasonable competitiveness determination to review of terms and conditions offered to the consumer – in fact, the word "consumer" or "customer" or a synonym does not appear in the provision at all. Thus, while TRIP's interpretation may be correct, a second reasonable interpretation would be that competitiveness would not be limited to the consumer's perspective. TRIP does not provide much argument to support its interpretation, and provides no case law or other authority. Liberty does not even respond meaningfully to TRIP's on this point, relegating its argument to an anticipatory footnote in its opening summary judgment brief. On this record, the Court cannot resolve the ambiguity and, accordingly, the Court must deny TRIP's motion for summary judgment on this point. *See Alexander*, 136 F.3d at 86.

### V.     Conclusion

For the foregoing reasons, the Court grants Liberty's motion for summary judgment in part, thereby dismissing Counts Two and Three of the Complaint, and denies it in part. The Court also denies TRIP's motion for partial summary judgment in its entirety. An appropriate order follows.

_____/s/ William J. Martini_____
**WILLIAM J. MARTINI, U.S.D.J.**

---

[8] Unfortunately, the exhibits to the Exclusivity Agreement are unreadable, and so the Court is unable to use them to aid its interpretation of this provision of the agreement.